**STEVENS v. UNITED STATES LINES CO. et al.**

**No. 4531.**

United States Court of Appeals
First Circuit.

March 16, 1951.

Rehearing Denied April 6, 1951.

---

Daniel J. Dempsey of Boston, Mass., for appellant.

Robert S. Erskine, New York City (Charles S. Bolster and Bingham, Dana & Gould, all of Boston, Mass., and Kirlin, Campbell, Hickox & Keating of New York City on the brief), for appellees.

Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and FORD, District Judge.

WOODBURY, Circuit Judge.

These are appeals by Charles E. Stevens, master and owner of the 38-foot wooden cabin cruiser Marie S., from interlocutory decrees in admiralty adjudging that he and his boat on the one hand, and the 10,000-ton freighter American Veteran and her owner, United States Lines Company, on the other, were jointly at fault for a collision between the two vessels in Boston Harbor on July 24, 1949, and referring the cause to a Commissioner to ascertain, compute and report damages. The jurisdiction of this court under Title 28 U.S.C.A. § 1292 (3) is clear.

Stevens, a carpenter by trade, operated his boat, as he was licensed by the Coast Guard to do, in the carriage of paying passengers on all-day fishing trips out of Boston Harbor. On Sunday, July 24, 1949,

he went on such a trip taking three non-paying guests, one of whom acted as engineer, and sixteen paying passengers. On his return up Boston Harbor at about 4:50 in the afternoon the Marie S. was in collision with the American Veteran, as a result of which the Marie S. was cut in two and all on board were thrown into the water. All suffered from shock and immersion, some in addition were more seriously injured, and one paying passenger lost her life by drowning.

As a result of the catastrophe three libels in admiralty, in rem and in personam, were brought against the American Veteran and her owner and claimant, United States Lines Company. One libel was brought by the Administrator of the deceased passenger, another was brought by the fifteen surviving passengers, and the third by Stevens and his three guests. The United States Lines impleaded Stevens as a respondent under General Admiralty Rule 56, 28 U.S. C.A. in the first two libels, answers were filed in all of them, and the three libels were heard together by the court below and disposed of in a single opinion consisting of findings of fact and conclusions of law.

From the findings of fact and the undisputed testimony it appears that Stevens first noticed the American Veteran about 4:30 o'clock when she was coming up the channel a mile or so astern. At that time the Marie S. was doing about 6 knots and the Veteran about 12½, which was soon reduced to 8, as she came into more crowded waters. Both vessels were on the same generally westerly course up the right hand or northerly side of the channel. The weather was clear and sunny and the sea calm, and there were many other vessels, some large commercial ones and some small pleasure boats, both sail and power, using the channel in and out of the harbor at the time.

When Stevens first noticed the Veteran he took no note of her speed and he did not thereafter keep her under observation. In fact he did not see her again until his guest engineer called his attention to her a matter of seconds before the collision when she was almost on top of the Marie S. Stevens then attempted to get clear by putting his rudder hard right, but the maneuver failed, and the stem of the Veteran struck the Marie S. on her starboard quarter.

Those in charge of the American Veteran first observed the Marie S. particularly when she was about half a mile ahead. At that time the captain of the Veteran was on the left or port wing of the bridge, and the pilot on the right or starboard wing, keeping the buoys marking that side of the channel under observation. As they approached buoy No. 2, at which point the channel turns 20° north westerly, or to the right facing up channel in the direction in which the vessels were travelling, the captain of the Veteran said the Marie S. was on a parallel course off his port bow about 150 feet ahead and about 120 feet to port. The pilot at that point ordered a right rudder on the Veteran to take it around the angle in the channel, and the captain of the Veteran stepped across the bridge to the wheelhouse to see that the helmsman obeyed the pilot's order. When the captain returned to his post on the port wing of the bridge 10 seconds or a little more later, the Marie S. was not in sight. Assuming that she must be under his bow, the captain at once ordered his engines "full astern", but the crash of collision occurred almost immediately. No passing signal had been given by the Veteran.

On these facts the District Court found both vessels at fault for the collision, and in consequence concluded that the rule of divided damages must be applied as between them. With respect to the Marie S. it specifically found "that Stevens was at fault in not being aware of the proximity of the freighter until it was too late. He knew the freighter was approaching him, his speed was slow, and he should have occasionally glanced through the rear windows of his pilothouse. Such action on his part would have readily enabled him to sight the approach of the freighter in sufficient time to have blown a warning signal, if he thought the freighter did not see him, or even to have taken some action to avoid the freighter. Any of these alterna-

tives would have prevented the collision and cared for his own safety and that of his passengers." [90 F.Supp. 898, 899.]

The District Court rested its conclusion of fault on the part of the American Veteran largely on the failure of the captain of that vessel to sound any overtaking signal before he turned aside to check his quartermaster's obedience of the pilot's command of right rudder. It said: "A speed of 8 knots per hour in the heavy Sunday traffic which existed on the afternoon of the collision could only be justified by every possible precaution. He [the captain] was bound under the circumstances, if not by the rules of the road, to warn craft of his approach at such a speed. In addition to his failure to sound a warning which under the circumstances I find was needed, he chose to leave the bridge to check on the quartermaster. Even if the negligence of Stevens contributed to the collision, the collision might have been avoided had Stevens been signaled that a passing was about to occur."

■ By cross assignments of error, a practice in admiralty tacitly sanctioned by this court in Rugo Construction Co. v. New England Foundation Co., 1 Cir., 1949, 172 F.2d 964 [1] the appellee, United States Lines, presents the contention that the court below erred in law in holding the American Veteran guilty of any fault whatever contributing to the collision. The contention is that as a matter of law the speed of the American Veteran was not excessive, that as a matter of law the captain of the Veteran was not at fault for checking his helmsman's obedience to the pilot's order of right rudder instead of keeping the Marie S. under continuous observation, and that the Veteran was not required by law to blow any overtaking

signal to a small motor boat like the Marie S.

■ We find no occasion to consider this contention item by item. It will suffice to say that the American Veteran was clearly "an overtaking vessel" with respect to the Marie S. within the definition of Article 24 of the Inland Rules, 33 U.S.C.A. § 209, which obviously are applicable, and that we are not at all convinced by the strained argument of the appellee that the Veteran was under no legal duty to sound an overtaking signal to her in spite of the clear command of Article 18, Rule VIII of the Inland Rules, 33 U.S.C.A. § 203, quoted so far as material in the margin.[2] Moreover, even if the above specific rule should not apply, still we think it obvious that the special circumstances of the case were such as imperatively to call for an overtaking signal from the Veteran as an additional precaution under the general requirement of Article 29, 33 U.S.C.A. § 221, of the Inland Rules to be considered in more detail hereafter. It therefore follows that the District Court's finding of causal fault on the part of the Veteran is not to be disturbed.

The question of the causal fault of the Marie S. is not so readily disposed of.

Stevens' quarrel is with the District Court's finding that he "was at fault in not being aware of the proximity of the freighter until it was too late. He knew the freighter was approaching him, his speed was slow, and he should have occasionally glanced through the rear windows of his pilothouse." He says in substance that he was under no duty to maintain a lookout astern, and that inasmuch as the Veteran was the overtaking vessel, his as the one being overtaken, was privileged, and hence, until signalled, he was

---

1. See 4 Benedict on Admiralty §§ 556 and 571.

2. "When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall direct her course to starboard; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall direct her course to port; * * *."

under no duty even to glance around to see if the Veteran was going to overtake him, or to keep the Veteran under any sort of observation after he first saw her some twenty minutes before the collision. In short, he says that as the privileged vessel he was entitled to proceed up the channel without looking behind, or indeed looking anywhere but ahead, even though he knew the Veteran was somewhere behind him, until he should receive an overtaking signal, which as already appears, was never given by the Veteran.

■ The argument seems to rest in part upon a misconstruction of the District Court's finding inasmuch as it appears to assume that the court below found that Stevens was required to establish a look-out astern in the sense of a man posted there on watch with no other duties to perform and alert to overtaking traffic. We concede that Stevens was not obliged to maintain a lookout astern in this strict sense. But the court below did not so find. What it found, and all that it found, was that under the special circumstances of the particular case, Stevens was required occasionally to glance around to see what might be coming up from behind.

It is true that there are cases which stand squarely for the general proposition that until an overtaking vessel sounds a passing signal there is no obligation on the part of those on the vessel being overtaken to look around even before making an unexpected, or not reasonably foreseeable, change of course. There are also, however, cases which hold to the contrary, at least when the presence of the vessel astern is known by those on the vessel ahead. For illustrative cases see Griffin on Collision, § 64. And there is a case in this circuit in which liability was imposed on a vessel run into from behind when she had stopped in a fairway in a fog on the ground of failure to post a lookout to watch for a vessel astern whose presence was known, or reasonably should have been anticipated.

Boston Sand & Gravel Co. v. United States, 1 Cir., 7 F.2d 278. These, however, are all cases in which the vessel ahead changed her course or speed without anyone on board looking around, and this is not such a case. There is no evidence of any change of speed on the part of the Marie S. for a long time prior to the collision, and although appellee contends, and there is some evidence to show, that the Marie S. gradually swung or veered to her starboard during the last few minutes before the collision, the court below did not so find. We treat the case, therefore, as one in which the vessels involved were proceeding up the channel one behind, or practically behind, the other, the one in front at a slower speed and making no change in course until a matter of seconds before the impact when her rudder was put hard right in a futile last moment attempt to escape. The question then is as to the applicability to an overtaken vessel of the rule with respect to maintaining a lookout under these particular circumstances.

■ The lookout rule embodied in Article 29 of the Inland Rules quoted in the margin [3] is broad and general in its terms. It does not spell out what constitutes a "proper lookout" or even under what circumstances one must be kept. It leaves these matters at large to be determined by reference to the "ordinary practice of seamen" or to the "special circumstances of the case." That is to say, the statute establishes a standard of conduct by which to measure the behavior of mariners with respect to maintaining a lookout under the various circumstances which they may encounter, not a specific rule, or series of rules, for particular specified situations. In keeping with the statutory scheme we shall not attempt to put a gloss upon the statute by laying down a rigid legal rule of general application with respect to what constitutes a "proper lookout" in a particular situation, or as to the specific circumstances under which some sort of lookout must be kept.

3. "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

Instead of tailoring hard and fast legal rules to fit specific states of fact as they arise in their infinite variety in these cases, we think it preferable to state as a general proposition that the article in question requires a lookout in every direction from which danger may reasonably be expected to arise, and that the quality and diligence of the lookout required depends upon the degree, and imminence of the danger reasonably to be anticipated.

This is the way the court below regarded the rule and we approve of its application by that court to the particular factual situation disclosed by the evidence.

In the first place there is ample evidence in the record to show that it was the ordinary practice of seamen in Stevens' situation not merely to keep a lookout ahead, but in addition to glance around once in a while to note the course, speed, and character of other vessels in the vicinity. In the second place it seems to us that one operating a small, slow moving vessel, carrying paying passengers up the main ship channel of a busy harbor at a busy time, is required by the dictates of prudent navigation to glance around occasionally at traffic astern, particularly when he knows that a large and relatively unmaneuverable ocean-going vessel is coming up the channel behind him. Moreover, even though Stevens was on the holding on course, he was required by Article 27 of the Inland Rules, 33 U.S.C.A. § 212 [4] to swing off his course at the last practical moment to avoid a collision with the Veteran if it should appear that the latter in violation of its duty to give way was not going to keep clear. Obviously Stevens could not perform this statutory duty without keeping some sort of lookout around, and having seen the Veteran, without keeping her under some sort of observation. In short, we find no error in the District Court's conclusion that Stevens was required to glance through the rear windows of his pilothouse

occasionally, and that had he done so he could readily have avoided the collision.

The decrees of the District Court are affirmed.

4. "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."