**R. O'BRIEN & CO., Inc.**

v.

**S. S. VENTURA, her engines, etc.**

**R. O'Brien & Co., Inc., Petitioner for Limitation of Liability.**

**Nos. 51-74, 51-83.**

United States District Court,
D. Massachusetts.

Sept. 13, 1954.

Bingham, Dana & Gould, Arthur J. Santry, Putnam, Bell, Dutch & Santry, Boston, Mass., for plaintiff.

The Texas Company, Thomas H. Walsh, Boston, Mass., for defendant.

McCARTHY, District Judge.

On November 28, 1951, at approximately 5:25 P.M., a collision occurred between the Lynn, a 102 foot Diesel-powered steel hull fishing vessel, and the Ventura, a 503 foot 10,000 ton steel hull tanker. The Lynn was owned by R. O'Brien & Co., Inc., a Massachusetts corporation. The Ventura was operated by the Texas Company.

There are now at issue before the Court only the libel of R. O'Brien & Co., Inc. against the Ventura, and the cross-claim of the Ventura interests against R. O'Brien & Co., Inc., represented by the Texas Company's claim and answer in the Lynn limitation proceedings.

The Lynn, fully manned and in good condition, left the Boston Fish Pier at about 4:30 P.M. on November 28, 1951, bound for Georges Fishing Banks. The sun had set a short time previously. The running lights of the Lynn, consisting of the white stern light, white masthead light, red port sidelight and green starboard sidelight, were on. These could be seen normally a distance of at least five miles under the conditions then prevailing—clear weather, calm sea, light wind. Deck lights were on also. She was preceded and followed by other fishing craft destined for the same fishing area.

The Lynn proceeded outbound through North Broad Channel, keeping close to the line of buoys on her right hand side of the channel. At about 5:14 P.M. when she was abreast of No. 3 buoy, her master, Captain McNamara, left the pilothouse and checked the sidelights. At that time he saw the range lights of a vessel in President Roads, about a mile and a half astern. He returned to the pilothouse. The fishing vessel rounded No. 1 buoy close aboard, and headed so as to bring Graves Whistling Buoy slightly on her starboard bow. She was proceeding at a speed of between 8 and 9 knots. Captain McNamara stood in the starboard center window of the

Lynn's pilothouse. Hayes, the mate, was standing in the port center window. A Mr. King was at the wheel.

The S. S. Ventura, a T-2 type tanker, left the Union Oil dock at Chelsea, Mass., in ballast, bound for the Texas Company Refinery at Eagle Point, New Jersey, drawing 20 feet forward and 21.1 feet aft. She proceeded out through North Broad Channel (a narrow channel under the Inland Rules) at a speed of 12½ to 13 knots. A licensed pilot, her master and chief officer were on the bridge. A quartermaster was at the wheel, and a seaman stood watch as lookout on the bow. In the vicinity of No. 7 buoy the Ventura overtook and passed two trawlers one of which was the M. C. Ballard. As she approached the Ballard, the Ventura blew a one-whistle signal to pass on the Ballard's starboard side, but received no answer. Those in the pilothouse of the Ballard did not hear the signal. Her Captain, however, who was on deck when the Ventura was about 1,000 feet astern, told the mate to answer the signal, and motioned him to bring the Ballard to port. The helmsman swung the Ballard left, and the tanker passed her about thirty to fifty feet away, "rolling" the Ballard as a result. The Ballard had not answered the Ventura's passing signal.

The Ventura made a gradual swing around No. 1 buoy to her right so as to bring Graves Whistler on her starboard bow. She swung to 73° which brought Graves Whistler only 2 degrees on her starboard bow. At that time the Lynn, which was on a course for the Whistler, and the Ventura were on narrowly converging courses.

When the Ventura was about 250 yards away from the Lynn a two-whistle signal was blown, indicating a desire to pass the Lynn on the latter's port side. That signal was not heard aboard the fishing vessel. Those inside the Ventura's pilothouse just before the collision were the pilot, Hodgdon, Captain Pederson, Chief Mate Lindbloom, and the helmsman Awyzic.

The bow lookout of the Ventura, seaman Grimes, testified that when the vessels were about 500 to 600 feet apart, he rang one bell. At that time the tanker was still on her gradual swing to the right. After the Ventura had swung far enough to bring the Lynn ahead of her, he rang three bells, indicating to the Ventura pilothouse that an object was dead ahead. He then rang two more sets of three bells each at intervals of a minute each, indicating that the Lynn was still dead ahead. He then rang "lots of jingles" on the bell until almost the moment of impact.

Aboard the Lynn, about seven minutes after the vessel had proceeded on her course from No. 1 buoy, Captain McNamara left the window at which he had been standing, and walked to the open door to his quarters immediately aft of the wheelhouse. He reached up on his bunk to get his cap, and heard a bell being rung. He signalled his engine room for slow speed ahead, opened the starboard door of the wheelhouse and saw nothing. He then crossed to the port door and looked out. He saw the bluff of the Ventura's bow coming over the Lynn's boat deck. He then rang "jingle" to the engine room for full speed ahead, told King to put the Lynn's wheel hard right, and helped him put the wheel over. He then felt the Lynn being pressed down stern first, her bow rising in the air.

The starboard side of the Ventura's flaring bow and the Lynn's port afterdavit first came in contact, pushing the Lynn's stern to starboard by the force of the impact and the Ventura's bow wave. The Lynn was swung to a position somewhat across the stem of the Ventura. The stem of the tanker then came in contact with the Lynn's port bulwark rail about thirty feet forward of the extreme stern (24 feet forward of the rudder post), cutting into the port side of the Lynn's hull with greater pressure as the Lynn turned over on her starboard beam ends. The Lynn swung around the bow of the Ventura, came

clear on the port side of it, and was passed by the Ventura on the latter's port side.

When the Lynn heeled over to her starboard, seawater rushed into the pilothouse. King was knocked clear of the wheel. Captain McNamara was washed into his quarters. As the water receded when the Lynn's reserve buoyancy asserted itself, King climbed over the wheel and compass and went out the port side window. Captain McNamara managed to get back to the wheelhouse, and assisted Hayes in getting out also. Rogers, the assistant engineer on the Lynn, also managed to get out of the vessel. The four men clambered to its side. They managed to get clear of the Lynn as she sank, at a point north of a line drawn between buoys No. 1 and No. 5. The wreck was found about 300 yards north of such a line, which is accounted for by the fact that, while the Lynn was lying across the stem of the Ventura, the Ventura was then swinging somewhat to the left, carrying the Lynn to the northward of her position at the time of collision, which was itself a short distance to the north of the line between the buoys.

■ Each of the three officers who testified that they were in the Ventura's pilothouse at and immediately prior to the collision stated, and I find it to be a fact, that the Ventura was overtaking the Lynn. The Inland Rules governed the navigation of the vessels at that time. Article 18 provides in part:

"Rule VIII. When steam vessels are running in the same direction, and the vessel which is astern shall desire to pass on the right or starboard hand of the vessel ahead, she shall give one short blast of the steam whistle, as a signal of such desire, and if the vessel ahead answers with one blast, she shall put her helm to port; or if she shall desire to pass on the left or port side of the vessel ahead, she shall give two short blasts of the steam whistle as a signal of such desire, and if the vessel ahead answers with two blasts, shall put her helm to starboard; or if the vessel ahead does not think it safe for the vessel astern to attempt to pass at that point, she shall immediately signify the same by giving several short and rapid blasts of the steam whistle, not less than four, and under no circumstances shall the vessel astern attempt to pass the vessel ahead until such time as they have reached a point where it can be safely done, when said vessel ahead shall signify her willingness by blowing the proper signals.

"The vessel ahead shall in no case attempt to cross the bow or crowd upon the course of the passing vessel." 33 U.S.C.A. § 203.

It is inescapably clear that the Ventura violated the provisions of this Rule. After blowing the two-blast signal, the pilot took no steps to reduce the Ventura's speed or to alter her course when he did not hear an answering whistle. Of particular importance was his remark that if you wait for an answering signal "sometimes you never get anywhere". The overtaking vessel received no assent to her whistle signal and yet she maintained a speed of twelve and one-half or thirteen knots until very shortly before the collision, and was proceeding at a speed of not less than ten knots at the moment of impact. Under no circumstances should the Ventura have attempted to pass the Lynn until such time as they had reached a point where it could be done safely.

Rule III of Article 18 provides that if, when steam vessels are approaching each other, either vessel fails to understand the intention of the other, the vessel in doubt shall signify the same by giving several short and rapid blasts. Those in charge of navigation aboard the Ventura should have blown a danger signal to the Lynn as soon as the imminence of collision was apparent. No such signal was given.

The sole question remaining is whether the Lynn too was at fault, and this must be answered in the negative. Once those aboard the Lynn were aware of the presence of the Ventura, it was too late to take effective measures. The only audible signals blown by the Ventura were not heard on the Lynn, and Captain McNamara had no reason to expect, in the absence of signals which were heard by him, that any vessel would crowd him to the extent of running him down.

It has been argued that Captain Mc-Namara was at fault in not being aware of the proximity of the Ventura until it was too late; that "for at least fifteen minutes before the collision, her master and the members of the crew who were in charge of the navigation of the Lynn were aware of the presence of a large ship, which proved to be the Ventura, about one mile or a mile and one-eighth astern and also bound out to sea"; that "those in charge of the navigation of the Lynn never looked astern again after Captain McNamara saw and reported that a large ship was coming out and to look out for her".

It is clear that Captain McNamara did see the Ventura prior to the collision. As related hereinbefore, when he went out to check the Lynn's lights (when he was abreast of No. 3 buoy) he saw a large vessel with her range lights open. He could not, however, tell whether the other vessel would come out of North Broad Channel or proceed out of Boston Inner Harbor through the Narrows. If the former, he could not know whether the other vessel would head eastward towards some northern New England port or proceed, as the Ventura eventually did, toward Graves Whistler. Under these circumstances he was under no duty to maintain a lookout astern. As was said by the Court of Appeals,

"* * * (T)he article in question (Article 29 of the Inland Rules) requires a lookout in every direction from which danger may reasonably be expected to arise * * *."

Stevens v. United States Lines Co., 1 Cir., 187 F.2d 670, 675. Captain Mc-Namara could not be expected reasonably to have anticipated danger from astern. Furthermore, if he had looked astern a few minutes before the collision he would have seen the Ventura making a wide gradual swing to her starboard around No. 1 buoy, well off on the Lynn's port quarter, with her range lights open, showing that she was not pointing at or even closely toward the Lynn. At such time he would have assumed that the other vessel would have given the Lynn the wide berth which would have been afforded had the Ventura not carried her swing too far to her right.

It has been contended that the facts in this case coincide with the facts and circumstances described in Stevens v. The American Veteran, D.C., 90 F.Supp. 898, affirmed sub nom. Stevens v. United States Lines Co., supra. This case, however, is clearly distinguishable from the Stevens case, so-called. In Stevens v. United States Lines Co., supra, the collision occurred in the inner harbor on a summer Sunday afternoon and under circumstances where one could reasonably expect to find a number of sailing craft. The captain of the smaller craft observed the larger vessel overtaking him on the same course which he was taking and at a distance of less than a mile astern, and he did nothing until immediately before the collision. The District Court specifically found that "He knew the freighter was approaching him, his speed was slow, and he should have occasionally glanced through the rear windows of his pilothouse".

The Court therefore finds that the Ventura alone was at fault. In the admiralty proceeding against the Ventura the libellant may have a decree for full damages with interest, the amount of the damages to be determined upon reference. The claim of the Texas Company in the limitation proceeding is dismissed and the R. C. O'Brien & Co., Inc., is awarded costs in both proceedings.