UNITED STATES of America,
Plaintiff-Appellee,

v.

ALASKA STEAMSHIP COMPANY,
Defendant-Appellant.

No. 71-2934.

United States Court of Appeals,
Ninth Circuit.

Jan. 28, 1974.

M. Bayard Crutcher (Argued) Edward S. Franklin of Bogle, Gates, Dobrin, Wakefield & Long, Seattle, Wash., for defendant-appellant.

Theodore A. LeGros (Argued) of Howard, LeGros, Buchanan & Paul, Stan Pitkin, U. S. Atty., Seattle, Wash., Lawrence F. Ledebur, Chief Admiralty & Shipping Section U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before KOELSCH and TRASK, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

Defendant-appellant, Alaska Steamship Company, has appealed from a judgment awarding plaintiff-appellee, United States of America, indemnity for a payment made in settlement of a longshoreman's personal injury claim.

### Statement of the Case

On February 24, 1966 James D. Harris, a longshoreman in the employ of Alaska Steamship, was injured while loading stores aboard the Creighton Victory, a public vessel owned by the United States. The Creighton Victory, on August 15, 1965, had been assigned for its operation to Alaska Steamship under a Service Agreement executed in 1956 whereby the United States appointed Alaska Steamship as a General Agent to manage public vessels assigned to it.[1]

Harris sued the United States, but prior to trial counsel for the Government's private insurance carrier, Commerce & Industry Insurance Company, settled the claim for $17,500. Alaska Steamship paid this amount, and also paid its counsel $304.73 for their services in investigating the accident.[2]

---

* Honorable W. J. Jameson, United States Senior District Judge for the District of Montana, sitting by designation.

1. The Creighton Victory was one of a number of Victory ships brought out of the reserve fleet during the Vietnam war and assigned to Alaska Steamship as General Agent for the Government. The Service Agreement is a standard form agreement, the terms of which are prescribed by 32A C.F.R. Chap. XVIII, Order AGE–1 (1973).

2. It appears from appellee's Exhibit 4, discussed *infra*, that counsel investigated the accident for Alaska Steamship Company's longshore insurance carrier.

Commerce & Industry reimbursed Alaska Steamship in the amount of $16,804.-73, and the Government paid the remaining $1,000, the amount of the deductible under the insurance policy.

The Government brought this action to recover from Alaska Steamship the amount of the settlement, plus costs and expenses. Alaska Steamship asserted a counterclaim for the cost of defending the action, alleging breach by the Government of its promise in the Service Agreement to insure and indemnify Alaska Steamship. Following trial the court in its findings of fact and conclusions of law accepted the Government's theory of the case, entered judgment for the Government,[3] and dismissed the counterclaim.

*Findings of District Court*

Findings of fact questioned by appellant and critical to a determination of this appeal include:

"IX. Alaska Steamship Company, on February 24, 1966, was engaged in business as a stevedore contractor acting by and through its Terminal and Stevedoring Division, which Terminal and Stevedoring Division submitted statement of account to the United States Department of Commerce, Maritime Administration, for charges assessed by that Division in rendering stevedoring services to the SS CREIGHTON VICTORY, including services rendered on February 24, 1966.

"X. The services rendered by Alaska Steamship Company, acting by and through its Terminal and Stevedoring Division, were performed pursuant to an independent oral agreement whereby Alaska Steamship Company, as

General Agent, employed Alaska Steamship Company Terminal and Stevedoring Division to stevedore the SS CREIGHTON VICTORY on February 24, 1966. To do this the General Agent transferred employees of its Terminal and Stevedoring Division from its privately owned vessel to the SS CREIGHTON VICTORY where work was assigned by the Alaska Steamship Company Terminal and Stevedoring Division foreman Lee Martin.

"XI. It was the regularly established business practice of Alaska Steamship Company as General Agent, to employ Alaska Steamship Company Terminal and Stevedoring Division to provide stevedoring services for public vessels for which Alaska Steamship Company was appointed General Agent. This method of operation was approved by the United States acting through its duly constituted officials and statements of accounts as submitted by Alaska Steamship Company Terminal and Stevedoring Division for such stevedoring services were duly approved and paid by the United States.

"XII. Alaska Steamship Company, as General Agent was under a duty to procure or provide stevedoring services to the vessels for which it was appointed General Agent, including the SS CREIGHTON VICTORY on February 24, 1966. Alaska Steamship Company, as General Agent, was empowered by the provisions of the General Agency Agreement, being contract MA-1224-GAA, Article 9 thereof,[4] to employ its own stevedoring department, being its Terminal and Stevedoring Division, to stevedore

3. The judgment was for $19,750.35 (the settlement of $17,500 and expenses of $2,250.-35), "together with plaintiff's costs and disbursements * * * taxed in the sum of $118.90".

4. Article 9 of the Service Agreement reads in pertinent part:
"(c) Notwithstanding any other provision of this Agreement, the United States, by

separate agreement, may contract with the General Agent to perform stevedoring, * * * or similar services for the vessels assigned hereunder, in which event the General Agent shall have the rights, benefits and the obligations and responsibilities provided in such agreement."

the SS CREIGHTON VICTORY. Under the oral contract of employment as a provision thereof was the obligation on the part of Alaska Steamship Company Terminal and Stevedoring Division to perform its work of loading stores in a workmanlike manner so as not to breach the warranty of workmanlike service owed by the stevedore to the shipowner.

"XIII. Alaska Steamship Company acting as an independent stevedore contractor through its Terminal and Stevedoring Division breached its warranty of workmanlike service owed to plaintiff as shipowner, which breach of warranty was the proximate cause of the accident to longshoreman James D. Harris. * * *"

### Contentions of Appellant

Appellant contends that (1) neither the United States nor Commerce & Industry had a right to claim indemnity from Alaska Steamship; (2) there was no "oral contract"; (3) this is an improper subrogation suit, brought for the benefit of an insurance company against one of its assureds; and (4) Alaska Steamship is entitled to judgment against the Government for the expense of defending this action.

### Right of Indemnity

Appellant contends that the district court should have dismissed the Government's action summarily on the ground that it is "wholly at odds with the long established policy of the Government to

protects its general agents from liability for personal injuries suffered aboard public vessels."

Article 6(a) of the Service Agreement requires that the Government provide insurance covering both the United States and the General Agent against all insurable risks relating to public vessels assigned to Alaska Steamship as General Agent. It provides that "Neither the United States nor the insurance underwriters shall have any right of subrogation against the General Agent with respect to any of the foregoing risks." It is argued that the injury to Harris was an "insurable risk" and that the Government and Commerce & Industry therefore have no right of indemnity against Alaska Steamship.

It is clear that no right of indemnity would exist with respect to the acts of Alaska Steamship as a General Agent. Appellee contends, however, and the district court found, that the services rendered by Alaska Steamship resulting in the injury to Harris were performed pursuant to an "independent oral agreement" and that Alaska Steamship was acting "as an independent stevedore contractor through its Terminal and Stevedoring Division".[5] The question of whether the Government and its insurer have a right of indemnity depends in large part upon a resolution of the second issue, i. e., whether there was a valid independent oral contract between the Government, through Alaska Steamship as its General Agent, and the Terminal and Stevedoring Division of Alaska Steamship.

---

5. On this basis Chalonec v. Prudential Lines, Inc., 474 F.2d 1336 (2 Cir. 1973), cert. denied, 414 U.S. 1002, 94 S.Ct. 357, 38 L.Ed.2d 238 (1973), cited by Alaska Steamship, is distinguishable. There a seaman brought suit against the General Agent. The district court granted a motion for summary judgment, holding that a General Agent cannot be sued for injuries sustained aboard a vessel owned by the Government and that the seaman's sole remedy was to sue the Government. The court of appeals affirmed without opinion. We are not concerned in this case with a claim by a crew member

against Alaska Steamship as a General Agent in the operation of the vessel. It is the Government's contention that this is an action against Alaska Steamship as an independent stevedoring contractor, rather than as a General Agent for the Government. Harris and the other longshoremen were not regularly employed on the Creighton Victory, but, as found by the district court, were transferred on the day of the accident from their work on one of Alaska Steamship's private vessels to the Creighton Victory, where work was assigned by the foreman of Alaska's Terminal and Stevedoring Division.

*Independent Oral Contract*

Alaska Steamship first argues that the finding of an independent oral contract has "no basis in law" because in effect it constitutes a holding that a corporation may contract with itself—a legal impossibility.[6] The Government contends, however, that in making the contract with its Stevedoring Division Alaska Steamship was acting in its capacity as a General Agent for the Government, so that the oral contract was in effect between the United States and Alaska Steamship's Stevedoring Division. Alaska Steamship next argues that it did not have authority under the Service Agreement to make contracts binding upon the Government. The Government replies that in any event it became a party to the contract through ratification of the General Agent's actions by paying Alaska Steamship for the stevedoring services.[7]

■■ The initial question for determination is whether the district court's finding of an independent oral contract is supported by substantial evidence. "In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous. * * * A finding is clearly erroneous when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed' * * *." McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954).[8] In determining whether a finding is clearly erroneous we "must view the evidence in the light most favorable to the party who prevailed below; such a party must be given the benefit of all inferences that may reasonably be drawn from the evidence." Pacific Queen Fisheries v. Symes, 307 F.2d 700, 706 (9 Cir. 1962). This is true even where the finding rests on an inference drawn from undisputed facts or documentary evidence and is not based on the trial court's opportunity to judge the credibility of witnesses. Lundgren v. Freeman, 307 F.2d 104, 113–115 (9 Cir. 1962); Wright & Miller, Federal Practice and Procedure: Civil § 2587 (1971), quoting with approval from Lundgren v. Freeman.

It is clear that the Service Agreement permitted a separate contract for stevedoring. There is no direct evidence that the parties entered into any formal separate agreement. In support of the district court's finding of an independent oral contract the Government relies primarily, as apparently did the district court, upon five exhibits.

Exhibit 1, an accident report of Harris' injury, shows Alaska Steamship Company as employer, its business as "Shipping", and is signed by the "Chief Clerk, Stevedore Division". Exhibit 2, a time sheet for the longshore gang on February 24, 1966, bears the stamped heading "ALASKA STEAMSHIP COMPANY, TERMINAL & STEVE. DIV.". These exhibits merely show that Harris was an employee of Alaska Steamship's

6. See 1 Fletcher, Corporations § 29 (1963).

7. As noted *supra*, Note 3, Article 9(c) of the Service Agreement provides that the United States, by separate agreement, may contract with the General Agent to provide stevedoring services, "in which event the General Agent shall have the rights, benefits and the obligations and responsibilities provided in such agreement".

8. Alaska Steamship does not dispute that the clearly erroneous rule applies here, but argues that because the trial court signed without change the findings of fact, conclusions of law, and judgment prepared and filed by counsel for the Government, the decision "amounted to no more than a general verdict", and the findings of fact and conclusions of law "had no significance except as they coincided with the evidence". Although the Supreme Court, as well as most appellate courts, have been severely critical of the practice of having findings prepared by counsel and mechanically adopted by the court, they "are formally his; they are not to be rejected out-of-hand, and they will stand if supported by evidence". United States v. El Paso Gas Co., 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964).

Stevedoring Division, which is not disputed by Alaska Steamship.[9]

Exhibit 3, described by the Government as "the most meaningful exhibit" and "the crucial evidence most graphically demonstrating the validity of the position of the United States", is an invoice from "Alaska Steamship Company, Terminal & Stevedoring Division" to "U. S. Department of Commerce, Maritime Administration, National Shipping Authority, c/o Alaska Steamship Company, Agents", for "labor used to load ship stores to the SS Creighton Victory" on February 21 and 24, 1966. The invoice bears an approval stamp of the purchasing agent of the Maritime Administration.

Article 5 of the Service Agreement provides that "The United States shall advance funds to the General Agent to provide for, and the General Agent shall receive credit for all expenditures of every kind made by it in performing, procuring or supplying the services, facilities, stores, supplies or equipment as required hereunder * * *." In compliance with this Article, Alaska Steamship established a General Agency account to which the Government's advanced funds were credited and from which Alaska Steamship paid its expenses incurred in the performance of the Service Agreement.[10] The Government contends that the "special handling" of the stevedoring expenses for the Creighton Victory on the date of Harris' accident, that is, the fact that they were billed directly to the Government without going through the General Agency account, indicates that the stevedoring services were a "special service performed by Alaska Steamship Company outside of the General Agency Agreement". This was a permissible inference to be drawn from Exhibit 3, especially in view of the fact that Alaska Steamship did not produce a witness to explain the "special handling" indicated by Exhibit 3.[11]

Exhibit 4 is a letter to E. A. Breitkreutz, a marine underwriter, from the attorneys for Alaska Steamship, dated March 11, 1968 and written upon receipt of the complaint in the personal injury action filed by Harris.[12] The letter states in pertinent part:

"Alaska Steamship Company, as general agent, employed its own stevedoring department to stevedore the CREIGHTON VICTORY." * * *

"The question presented in this case is whether Alaska Steamship Compa-

---

9. When the Service Agreement was signed in 1956 Alaska Steamship had no stevedoring services, and the stevedoring was done by a separate corporation. Thereafter, and prior to 1966, this corporation became a division of Alaska Steamship. Sometime before the Harris accident the Terminal and Stevedoring Division was discontinued, and its functions were taken over by a Marine Terminal Operations Division. The term "Terminal and Stevedoring Division" was used by the district court and at the time of the Harris accident was still used by Alaska Steamship on time sheets and payrolls for Pacific Maritime Association accounting.

10. The "Teletype Message" from the Government confirming the assignment of the Creighton Victory to Alaska Steamship states "You are requested to pay any authorized cost out of your corporate funds subject to reimbursement under" the Service Agreement.

11. Alaska Steamship called as witnesses J. E. Zumdieck, one of its vice-presidents, and John J. Jones, its executive assistant for the General Agency operated vessels who testified that Alaska stored and operated "the General Agency ships just as though they were operating as our own particular vessels, and in the same manner". Neither witness was familiar with the accounting and billing procedures for stevedoring services. Zumdieck testified this was handled by the company's Comptroller, although he stated further that those services were billed in the same manner as the Company billed for other General Agency expenses. Jones suggested that the Government might have been billed separately for accounting purposes, but admitted that he was not familiar with the accounting or billing—that this was the responsibility of a Mr. Reem. Neither Reem nor anyone from the Comptroller's office was called to explain the billing.

12. Alaska Steamship argues that Exhibit 4 was improperly admitted. When the exhibit was offered counsel for Alaska Steamship objected on relevancy grounds, but he later withdrew the objection, stating "we have no further objection to this letter".

ny as general agent, which hires its private stevedore employees to stevedore a general agency vessel, may be classified as a *YAKA* [13] situation, which would immunize Alaska Steamship Company from any indemnity action." [14]

We agree with the Government that the trial court could reasonably infer from this letter of Alaska Steamship's counsel (in conjunction with the other evidence) that Alaska's Stevedoring Division had been employed as an independent stevedoring contractor to stevedore the Creighton Victory. Alaska Steamship urges that the terms "employed" and "hires" simply meant "made use of" and not "contracted with". The terms are susceptible of either interpretation. We cannot say that the trial court's interpretation was "clearly erroneous", giving to the prevailing party the "benefit of all inferences that may reasonably be drawn from the evidence". *Pacific Queen, supra* at 706.

Exhibit 5 is a letter from the president of Alaska Steamship to the Maritime Administrator, dated June 24, 1970, seeking dismissal of this action and the recovery of attorney fees. In itself the letter is of little value except as a statement of the position of the parties. It recognizes that the Government contends that Alaska Steamship was acting in a dual capacity—as General Agent and as a stevedore contractor. It states that it is the position of Alaska Steamship that all services were rendered as General Agent and relies upon Articles 6(a), (b) and 9(a), (b) of the Service Agreement.[15]

Article 9, dealing with "Related Services", provides in 9(a) that "Agreements or arrangements with any interested or related company to render any service or to furnish any stores * * * or facilities * * * shall be submitted to the United States for approval" and unless so approved "compensation paid to any interested or related company shall be subject to review and readjustment by the United States". Article 9(b) provides that "The United States shall, when it may legally do so, have the advantage of any existing, or future, contracts of the General Agent for the purchase or rental of * * * services * * * provided that any financial loss or disadvantage to the General Agent shall be compensated for in such amount as may be determined by the United States". As noted *supra,* Article 9(c) authorizes a separate agreement with Alaska Steamship Company for stevedoring and similar services.

Construing Articles 3 and 9 together there were three alternative methods of providing stevedoring services: (a) Alaska Steamship could provide the services as a part of its duties as General Agent under Article 3; (b) it could procure the services from someone

13. The reference is apparently to Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), which involved a libel *in rem* by a longshoreman against a ship for injuries sustained while loading the ship as an employee of a corporation which was operating it under a bareboat charter. The ship's owner brought in the longshoreman's employer as an additional defendant. The Court held that the longshoreman could recover against the ship, but that the ship's liability would be shifted to the longshoreman's employer, as owner *pro hac vice,* for the ship's unseaworthiness. The crux of the decision was the holding that recovery against the employer was not barred by the Longshoremen's and Harbor Workers' Compensation Act, which provides that compensation liability of an employer under the Act is exclusive.

14. The letter stated that counsel had "investigated this matter for the Alaska Steamship Company's long shore carrier" and were concerned with the question of whether Mr. Breitkreutz wished them to handle "the defense of this case on behalf of the United States" by reason of their previous employment in the investigation.

15. Zumdieck, who prepared the letter, testified that the original draft of the letter included a reference to Article 3 of the Service Agreement, which was omitted by error in the final draft. Article 3 prescribes in detail the "Duties of the General Agent", including the duty to "Conduct the business of the vessels * * * and procure or provide all services incident thereto, including * * * stevedoring * * * *".

else under Articles 3 and 9(a) and (b); or (c) there could be a separate agreement whereby Alaska Steamship would provide the services pursuant to Article 9(c). While the letter from the president of Alaska Steamship states that it was the position of the company that all services rendered were in its capacity as General Agent, the reliance on Articles 9(a) and (b) would indicate that the stevedore services were performed by an "interested" or "related" company pursuant to 9(a) or a separate contract with someone else under 9(b). The district court obviously relied on Article 9(c) in finding a separate oral agreement.[16]

■ Viewing all of the exhibits and oral testimony as a whole we conclude that there was sufficient evidence to sustain the finding of the district court that the "services * * * were performed pursuant to an independent oral agreement whereby Alaska Steamship Company, as General Agent, employed Alaska Steamship Company Terminal and Stevedoring Division to stevedore the SS CREIGHTON VICTORY on February 24, 1966". Two related questions remain: (1) could Alaska Steamship Company as General Agent bind its disclosed principal, the United States, to an oral contract with Alaska's Terminal and Stevedoring Division under the authority granted in Article 9(c); and (2) if not, did the United States create a valid oral contract by ratification?

Alaska Steamship argues that the finding of an independent oral contract constitutes a holding that a corporation may contract with itself, and that in any event Alaska Steamship had no authority under the Service Agreement to make contracts binding the United States.

■ It is of course true that one may not contract with himself. Restatement of the Law, Contracts (1932) § 15 states the general rule that "There must be at least two parties in a contract", and Comment a reads:

"It is not possible under existing law for a man to make a contract with himself. This rule is one of substance and independent of mere procedural requirements. Even though a man has different capacities, as for instance as trustee, as executor, as partner, as an individual, it is impossible as [a] matter of substantive law for him by his own individual will or expression to contract with himself."[17]

■ Neither the rule nor the supporting cases cover the situation here presented. Counsel have not cited, nor have we found, a case precisely in point.

16. Appellant has one further contention: that by reason of appellee's failure to call as a witness Captain Huxtable, "the local officer of the Maritime Administration who dealt with Alaska Steamship regarding its conduct of business as General Agent", it is a "fair assumption" that Captain Huxtable's testimony would have been adverse to the Government. The only reference to Captain Huxtable in the transcript is the testimony of the witness Jones that "we were advised [by Huxtable] that we were to store and operate the General Agency ships just as though they were operating as our own particular vessels, and in the same manner". He did not have "any discussions with Captain Huxtable as to the way in which the stores were loaded properly or provided to the ships" because "they had no concern, it was * * * our responsibility as a General Agent to see that the ship was properly planned and stored and ready for the Navy or whenever they required the ship to be at a loading berth". This testimony is not inconsistent with appellee's position that there was a separate oral contract for the stevedoring services. Moreover, Huxtable could have been called as a witness by appellant.

17. As illustrations of this principle Alaska Steamship cites Forest Investment Corp. v. Chaplin, 55 Ill.App.2d 429, 205 N.E.2d 451 (1965), which holds that a sole proprietor of a business may not contract with the business; Yosemite Portland C. Corp. v. State Board of E. of Cal., 59 Cal.App.2d 39, 138 P.2d 39 (1943), which holds that a city may not contract with one of its own departments; and Sinclair Refining Co. v. Long, 139 Kan. 632, 32 P.2d 464 (1934), which held that there could be no contract between an individual and a corporation where it was alleged that the contract had been made by the individual, in his personal capacity, with himself as general manager and president of the corporation.

The Government argues that in making the contract with its Stevedoring Division Alaska Steamship was acting as agent for the United States, its principal, and that the contract was between two separate entities, the United States and Alaska's Terminal and Stevedoring Division. The district court found that Alaska Steamship was empowered by Article 9 of the Service Agreement to employ its own stevedoring department and concluded that Alaska Steamship, as General Agent, under an oral contract employed its Terminal and Stevedoring Division as an independent stevedore contractor. We incline to the view that by reason of the contractual provisions, and particularly Article 9(c), the district court was correct in concluding that there was a valid independent oral contract. We base our affirmance, however, primarily on our conclusion that the United States in any event made the contract binding by ratification.

Restatement, Second, Agency (1958) § 82 defines "Ratification" as follows:

> "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him."

The district court found (Finding XI) that "It was the regularly established business practice of Alaska Steamship Company as General Agent, to employ Alaska Steamship Company Terminal and Stevedoring Division to provide stevedoring services for public vessels for which Alaska Steamship Company was appointed General Agent", that this method of operation "was approved by the United States", and that "statements of accounts as submitted by Alaska Steamship Company Terminal and Stevedoring Division for such stevedoring services were duly approved and paid by the United States". The district court's finding that the invoices for stevedoring required and received the approval of the United States through its Maritime Administration was proper, based upon Exhibit 3 and the testimony of Alaska's witness Jones.[18] Accordingly, we hold that the action of the United States in approving and paying for the stevedoring services rendered for the Creighton Victory on February 24, 1966 constituted a ratification of the oral contract for stevedoring services, entered into between Alaska Steamship, as General Agent and its Terminal and Stevedoring Division.

### Liability of Alaska Steamship as Stevedoring Contractor

It is well settled that a shipowner may recover indemnity from a stevedore contractor for breach of the stevedore's implied warranty of workmanlike service. Ryan Co. v. Pan-Atlantic Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); Italia Soc. v. Ore. Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964); Ryan v. Pacific Coast Shipping Co., Liberia, 448 F.2d 525 (9 Cir. 1971). There is ample evidence to support the finding of the district court that Alaska's breach of its implied warranty of workmanlike service was the proximate cause of the injury to longshoreman Harris.

### Is this an Improper Subrogation Suit?

Alaska Steamship alternatively argues that even if there was an independent oral contract the Government's case must nevertheless fail since it is in effect a subrogation suit brought for the benefit of Commerce & Industry Insurance Company against one of its own assureds.

Commerce and Industry Insurance Company issued a policy insuring "ALASKA STEAMSHIP COMPANY,

---

18. Jones testified in part:
   "Q And with the exception of getting prior approval of the Maritime Administration on the invoices, was there anything different about the way in which the CREIGH-TON VICTORY was provisioned on this occasion? And your own ships?
   "A No, it was identical, the same procedure."

Policyholder and General Agent under Service Agreement with the United States of America and the United States of America", agreeing to indemnify the assured against loss resulting from liability for " * * * personal injury to * * * any person", not including "liability to an employee (other than hereafter excepted) of the assured * * * under any compensation act'. [19]

Clause 22 of the policy provides that "The Underwriter shall be subrogated to all the rights which the Assured may have against any other person or entity, in respect of any payment made under this policy, to the extent of such payment, * * *."

Article 6(a) of the Service Agreement reads in pertinent part:

"Neither the United States nor the insurance underwriters shall have any right of subrogation against the General Agent with respect to any of the foregoing risks. All insurance hereunder shall cover both the United States and the General Agent when acting hereunder or as sub-agent of another General Agent of the United States with respect to vessels assigned by the United States to such other General Agent."

The district court found (Finding XIV) that the United States brought this action against Alaska Steamship "in its capacity as an independent stevedore contractor * * * and not in its capacity as General Agent". It concluded that the "action is not a subrogation suit against the General Agent as prohibited by article 6(a)" but "an action by a shipowner against an independent stevedore contractor for indemnity for damages occasioned by the breach on the part of the independent stevedore contractor of its warranty of workmanlike service". (Conclusion of Law IV).

We agree. Alaska Steamship was insured by Commerce & Industry against Alaska Steamship's liability as General Agent.[20] The recovery here is based upon the independent oral contract between the United States and Alaska Steamship as an independent stevedore contractor.

Affirmed.

---

19. Clause 1(a) provides coverage under any Compensation Act
"in respect to an employee (i) who is a member of the crew of the insured vessel, or (ii) who is on board the insured vessel with the intention of becoming a member of her crew, or (iii) who, in the event of the vessel being laid up and out of commission, is engaged in the upkeep, maintenance or watching of the insured vessel, or (iv) who is engaged by the insured vessel or its Master to perform stevedoring work in connection with the vessel's cargo at ports in Alaska and ports outside the Continental United States where contract stevedores are not readily available."

20. Apparently Alaska Steamship carried a longshore policy with another company. See Note 14.