John M. PINTO, Plaintiff-Appellant,

v.

The M/S FERNWOOD, etc., Defendant-Appellee.

John M. PINTO, Plaintiff-Appellee,

v.

The M/S FERNWOOD, etc., Defendant-Appellant.

Nos. 74–1155 and 74–1156.

United States Court of Appeals, First Circuit.

Heard Sept. 6, 1974.

Decided Nov. 21, 1974.

Laurence J. Hoch, Boston, Mass., with whom Kisloff, Hoch, Shuman & Flanagan, Boston, Mass., were on brief, for John M. Pinto.

Richard A. Dempsey, Boston, Mass., with whom Leo F. Glynn and Glynn & Dempsey, Boston, Mass., were on brief for The M/S Fernwood, etc.

Before COFFIN, Chief Judge, McENTEE, Circuit Judge, CLARY,* District Judge.

CLARY, Senior District Judge.

This appeal has been taken from a decision of the United States District Court for the District of Massachusetts sitting in admiralty. The complaint was based on a collision which occurred between the *Liberty II*, a trawler owned by John Pinto, and the *M/S Fernwood*, an ocean-going freighter of Norwegian registry. The case was tried before the Honorable Frank H. Freedman who filed an opinion setting forth findings of fact and conclusions of law. We affirm.

The *Liberty II* is a sixty-foot wooden vessel built in 1948. On the morning of February 16, 1969, she was involved in a collision with the *M/S Fernwood* in Massachusetts Bay. At the time of the incident the weather was clear, the sea calm and visibility excellent. The *Liberty II* had begun fishing at approximately 7:00 A.M., two hours before the collision. She was proceeding on a northerly course at four knots with the day signal displayed to indicate that she was fishing. Because the type of fishing required that the net be dragged along the bottom, the vessel was steering by means of slight course changes to avoid underwater obstacles. There were four other fishing vessels in the vicinity, three in line with the *Liberty II* but to the south and west, and one to the east of this group but on a southerly heading.

The *Fernwood* was enroute to Boston from Fall River via the Cape Code Canal at a speed of thirteen knots. The second mate and a helmsman were on the bridge, but no lookout was posted. Although Captain Pinto first sighted the *Fernwood* about two or three miles south of his position, he determined that she would pass safely to the east and so he continued fishing. He did not look for or see the *Fernwood* again until moments before the collision. The second mate of *Fernwood* testified that he saw three vessels while he was still two miles south of their position. He maintained course and speed, apparently unaware that they were fishing.

After *Fernwood* narrowly averted a collision with one of the fishing boats, she attempted to avoid the *Liberty II* by stopping engines and steering to starboard. At the same time, Captain Pinto turned to port and increased speed. Unfortunately, a collision resulted in spite of these maneuvers. *Fernwood* struck *Liberty II* in the starboard side at the forward gallows at an angle of 20–30 degrees. The momentum of the vessels kept them together until *Fernwood's* greater speed carried her past *Liberty II* which was heeled approximately 40 degrees to port by the impact. The trial court found that *Fernwood* had sounded none of the signals required by the Inland Rules, 33 U.S.C. §§ 151–232 (1970). Damage to *Fernwood* was minimal, and *Liberty II* returned to Plymouth under her own power after retrieving her nets.

Visible damage to *Liberty II* included the wrenching of both gallows, a cracked mast and scraped paint. After temporary repairs, she resumed fishing on February 19, 1969. The vessel under-

* Senior District Judge of Eastern District of Pennsylvania sitting by designation.

went annual maintenance in August of 1969, six months after the accident, and further repairs were made. She fished from August 1969 until August 1970 when she received a major overhaul. This work was not completed until February 1971. During this period, the vessel was "opened up" and all the starboard frames and some port frames were replaced. The removed framing was discarded, and there were no pictures or other evidence to indicate what the vessel looked like after it was "opened up" and before the old framing was removed. The defendant's surveyor did not see the vessel until rebuilding was in progress, and none of the old framing was kept for his inspection. Captain Pinto testified that 50% of the overhaul repairs were necessitated by the collision, while a boatyard employee testified that the figure was 70%.

Based on these findings, the trial judge came to several conclusions. He found that as a fishing vessel encumbered with heavy trawl, the *Liberty II* had the right-of-way against the *Fernwood*. He further found that *Fernwood* was negligent in not posting a lookout, in failing to keep clear of a fishing vessel, in failing to sound proper signals, and in failing to slacken speed and change course when necessary. The trial judge concluded that these acts of *Fernwood* were the proximate cause of the collision, and that Captain Pinto's conduct did not constitute negligence. Finally, the court found that plaintiff had failed to sustain his burden of proof in showing which repairs were necessitated by the collision and which were normal repairs for an "aging wooden vessel." None of the evidence introduced at trial indicated what the condition of the vessel was prior to the collision, what damage was caused by the collision, or what damage was attributable to the eighteen months of service after the collision. One-half of the 1969

repairs were found to be attributable to the collision, and judgment was entered for plaintiff in the amount of $448.77 plus interest and costs. Both parties have appealed, plaintiff from the award of damages and defendant from the finding of non-liability of *Liberty II*.

We shall deal with the defendant's appeal first. Defendant does not appeal from the finding that *Fernwood* was at fault, but from the finding that *Liberty II* was not at fault. We would first point out that as the appellant, defendant has a heavy burden to convince us that the trial judge erred in his findings. CIA. Maritima San Basillio S.A. v. Shell Canada Ltd., 490 F.2d 173 (1st Cir. 1974). In reviewing the judgment of the trial court sitting in admiralty without a jury, we may not set aside the judgment unless it is clearly erroneous; that is, although there is evidence to support the judgment, from a review of all the evidence we are left with the definite and firm conviction that a mistake has been made. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); United States v. Alaska S.S. Co., 491 F.2d 1147 (9th Cir. 1974). The evidence must be viewed in the light most favorable to the prevailing party below and that party must be given the benefit of all inferences that may reasonably be drawn from the evidence. United States v. Alaska S.S. Co., 491 F. 2d 1147 (9th Cir. 1974).

The defendant contends that both the failure of plaintiff to keep a proper lookout and plaintiff's sudden course change constituted negligence. We are unpersuaded that the trial judge erred in regard to either aspect. Article 29 of the Inland Rules requires that a "proper lookout" be kept as ". . . may be required by the ordinary practice of seamen. . . ." 33 U.S.C. § 221 (1970).[1] The adequacy of a lookout

---

1. Section 221 of the Inland Rules provides: *Usual additional precautions required generally* (article 29).

Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of

is a question of fact to be resolved by considering the totality of the circumstances. Cenac Towing Co. v. Keystone Shipping Co., 404 F.2d 698 (5th Cir. 1968).

 The trial judge found that the maneuver in the present case was not an ordinary "overtaking." [2] The *Liberty II* was a vessel engaged in fishing, and the Inland Rules require that a sailing vessel keep out of the way of such a fishing vessel. 33 U.S.C. § 211 (1970). Further, the Inland Rules require steam vessels to keep out of the way of sailing vessels. 33 U.S.C. § 205 (1970). Therefore, the trial judge reasoned, a steam vessel must keep out of the way of a fishing vessel. *See* Hertz v. Consolidated Fisheries, 213 F.2d 801 (9th Cir. 1954).[3] We find no fault with this conclusion. Even absent this finding of the trial judge regarding the status of steam and fishing vessels, expert testimony at trial indicated that it was the custom of steam vessels to keep out of the way of fishing vessels. Furthermore, as a general rule, an overtaken vessel is under no duty to keep a lookout aft, but has the right to act on the presumption that the overtaking vessel will keep clear. *See* The Delaware, 161 U.S. 459, 16 S.Ct. 516, 40 L.Ed. 771 (1896); Ellis Towing & Transp. Co. v. Socony Mobil Oil Co., 292 F.2d 91 (5th Cir. 1961); In re Landi's Petition, 194 F. Supp. 353 (S.D.N.Y.1960). Under all the circumstances revealed in the record, we cannot say that the trial court was clearly erroneous in determining that the failure to keep a more frequent lookout was not negligence.[4]

 Defendant also argues that plaintiff was negligent in not holding her course and speed as required by 33 U.S.C. § 206 (1970),[5] and in turning into the path of *Fernwood* immediately before the collision. The requirement

---

any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case. 33 U.S.C. § 221 (1970).

2. The definition of "overtaking vessel" and the requirement that she keep clear of the overtaken vessel are contained in 33 U.S.C. § 209 (1970).

3. The International Rules in effect at the time of the *Hertz* incident presented the same problem with regard to right of way between fishing and other vessels as the Inland Rules do in this case. Act of Aug. 19, 1890, ch. 802 § 1, 26 Stat. 326–328 (repealed 1951). The decision arrived at the same result as would have been explicitly required by the International Rules after 1954, the effective date of changes enacted in 1951 requiring that all vessels under way keep clear of vessels engaged in fishing. Regulations for Preventing Collision at Sea, Oct. 11, 1951, ch. 495 § 6, 65 Stat. 419, effective Jan. 1, 1954 (now 33 U.S.C. § 1088). The *Fernwood* argues that failure of Congress similarly to revise the Inland Rules should be read to imply an intent to leave deep draught ocean vessels free from the burden of exclusive responsibility to dodge vessels engaged in fishing. The argument is unpersuasive in light of the fact that the International Rule was revised not as a part of a comprehensive effort by Congress to modernize the International and Inland Rules, but in response to action taken at the International Conference on Safety of Life at Sea, which drafted an International Convention ratified by the United States Senate April 20, 1949. *See* H.R.Rep.No.5013, 82d Cong., 1st Sess. (1951), U.S.Code Cong. & Admin.Serv.1951, p. 548.

4. Defendant invites our consideration of the decision of this court in Stevens v. United States Lines Co., 187 F.2d 670 (1st Cir. 1951). We consider the *Stevens* case to be distinguishable on its facts from the present situation. In *Stevens*, the district court found the captain of a pleasure boat at fault for failing to be aware of the proximity of a freighter until too late to avoid collision. We agreed that the captain was not required to keep a lookout astern in the strict sense, but that the special circumstances of the case, a passenger-carrying pleasure boat on a Sunday afternoon in Boston Harbor, required some observation of traffic astern. On these facts, we upheld the decision of the trial court.

5. Section 206 provides:
 *Vessel having right-of-way to keep course* (article 21).
 Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed. 33 U.S.C. § 206 (1970).

that the privileged vessel keep her course and speed does not impose an absolute burden regardless of circumstances, or require that the vessel maintain the same compass direction at all times. Skibs Aktieselskapet Orenor v. The Audrey, 181 F.Supp. 697 (E.D.Va. 1960), aff'd sub nom., Gratsos v. The Moisie Bay, 287 F.2d 706 (4th Cir. 1961). The privileged vessel also maintains course and speed as required by section 206 notwithstanding changes in both course and speed so long as the changes are predictable. United States v. S.S. Soya Atlantic, 330 F.2d 732 (4th Cir. 1964).

There is sufficient evidence to support a finding that *Liberty II* was proceeding on a northerly course at a speed of four knots, and that while she made gradual alterations in compass direction to avoid underwater obstacles, these would be easily perceivable and expected of fishing vessels. Moreover, the evidence is not sufficient to compel us to reverse the implicit finding of the lower court that the *Liberty II* did not make a drastic course change into *Fernwood's* path and thereby caused the collision.

Based on its findings of the gross negligence of *Fernwood*, the trial judge correctly applied the "major and minor fault" rule. Alexandre v. Machan (The City of New York), 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84 (1893); General Seafoods Corp. v. J. S. Packard Dredging Co., 120 F.2d 117 (1st Cir. 1941).

Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be

resolved in its favor. Alexandre v. Machan (The City of New York), 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84 (1893).

■ This rule places the burden on *Fernwood* to show that *Liberty II* committed plain fault. General Seafoods Corp. v. J. S. Packard Dredging Co., 120 F.2d 117 (1st Cir. 1941). Since *Fernwood* has failed to meet this burden, we find no error in the decision of the trial court.[6]

We now come to the question of the trial court's findings concerning plaintiff's damages. Here the roles are reversed, and plaintiff must take up the burden previously borne by the defendant. CIA. Maritima San Basillio S.A. v. Shell Canada Ltd., 490 F.2d 173 (1st Cir. 1974). Having carefully reviewed the record and the findings of the trial judge, we are not presuaded that they are clearly erroneous, and therefore affirm the decision below.

■ Plaintiff must establish that the loss he has suffered and the expenses he has incurred were the result of the tortious conduct of the defendant. *See* Dreijer v. Girod Motor Co., 294 F.2d 549 (5th Cir. 1961). The measure of damage in maritime collision cases is expressed by the maxim *restitutio in integrum*. The Baltimore, 75 U.S. (8 Wall.) 377, 19 L.Ed. 463 (1869). While under this rule the measure of damage is the difference in value of the vessel before and after the collision, the cost of necessary repairs and the loss of earnings during repair have been regarded as the equivalent. Delta Marine Drilling Co. v. M/V Baroid Ranger, 454 F.2d 128 (5th Cir. 1972); The Pocahontas, 109 F.2d 929 (2d Cir.), cert. denied sub nom., Eagle Transp. Co. v. United States, 310 U.S. 641, 60 S.Ct. 1088, 84 L.Ed. 1409 (1940). The owner of the damaged vessel is entitled to sufficient damages to

---

6. Since we affirm the decision of the trial court that *Liberty II* was not guilty of statutory violations with respect to course and speed, we need not reach the issue of plain-

tiff's potential burden of proof as to his lack of responsibility for the collision. *See* The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L. Ed. 148 (1874).

put his vessel into a condition as seaworthy and serviceable as before the collision. Zeller Marine Corp. v. Nessa Corp., 166 F.2d 32 (2d Cir. 1948). However, the owner must show that the injury was caused by the fault of the other vessel, and that it had not been aggravated by his own fault. The Baltimore, 75 U.S. (8 Wall.) 377, 19 L.Ed. 463 (1869).

■ The trial judge found that when the *Liberty II* was "opened up" during the 1970–1971 overhaul all the starboard frames were replaced as well as some on the port side. As previously noted, these frames were discarded and no evidence existed of the condition of the vessel until the defendant's surveyor observed the actual rebuilding. There was no evidence of the use, or abuse, of the *Liberty II* during the eighteen month period after the accident and before the overhaul. Based on these findings, the trial judge concluded, in regard to the August 1970–February 1971 overhaul, that the plaintiff had not shown sufficient evidence to support an award of damages against the defendant. There was ample evidence to show what work was done, but insufficient evidence to show which repairs were proximately caused by the collision and which represented the normal maintenance for a wooden vessel built in 1948.[7]

We have carefully considered the findings of the trial judge and the evidence contained in the record. We do not doubt that substantial repairs were made. However, the record indicates that there were other causes which may have necessitated the extensive repairs, and plaintiff cannot meet his burden of proof by merely showing several possible causes for the damage exist, one of which is the negligent conduct of the defendant. *See* Dreijer v. Girod Motor Co., 294 F.2d 549 (5th Cir. 1961).

There is uncontradicted testimony in the record that a substantial amount of the repair work was performed by Captain Pinto and his son-in-law, Donald Clark. This included the temporary repairs as well as work done on the vessel during the 1970–1971 overhaul. Unfortunately, the same defects which we noted earlier plague the plaintiff in this aspect of his claim. Neither the district court nor this court is insensitive to the problem posed but we are not permitted to speculate as to the cause of the damage or the value of the repair work done by the plaintiff and his crew. Damages may only be awarded, once liability has been established, on the basis of evidence in the record and not sympathy for the prevailing party. Since we are unconvinced that the decision of the trial court on the matter of damages is clearly erroneous, it will not be disturbed.

Affirmed.

---

**7.** No issue is presented in regard to the $448.77 damages resulting from repairs in 1969. We therefore affirm the entry of judgment for this amount, plus interest and costs.