Donald P. COLLINS

v.

INDIANA & MICHIGAN ELECTRIC COMPANY.

Joseph GARDNER

v.

INDIANA & MICHIGAN ELECTRIC COMPANY.

Nos. EV 78–184–C, EV 78–185–C.

United States District Court, S. D. Indiana, Evansville Division.

April 30, 1981.

Sydney L. Berger, Evansville, Ind., for plaintiff.

John A. Lloyd, Jr., Cincinnati, Ohio, William E. Statham, Evansville, Ind., Barbara Bison Ford, Cincinnati, Ohio, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BROOKS, District Judge.

This matter came before the Court for trial on August 18, 1980. All parties were represented by counsel. The Court, having

heard the evidence, having considered all exhibits and depositions, and being duly advised in the premises, hereby enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. The plaintiff, Donald P. Collins, is a citizen of the State of Indiana, residing in Evansville, Vanderburgh County, Indiana. The plaintiff, Joseph Gardner, is a citizen of the State of Indiana, residing in Evansville, Vanderburgh County, Indiana.

2. The defendant, Indiana & Michigan Electric Company (I&M) is a domestic corporation incorporated under the laws of the State of Indiana, with its principal place of business and principal office in Fort Wayne, Indiana.

3. This is a case of admiralty or maritime jurisdiction within the meaning of 28 U.S.C. § 1333 and Fed.R.Civ.P. 9(h); therefore, this cause of action comes within the jurisdiction of this Court.

4. The plaintiffs were enjoying a July fourth weekend on a sandbar located near Mile 814. While the evidence was somewhat conflicting, it was apparent to the Court that the plaintiffs had been drinking most of the day and evening of July 3, 1978, prior to the collision of the motorboat operated by Gardner with a barge being towed by the vessel "Richard E. Hodges".

5. On July 3, 1978, Pilot John Gaines was operating a motor vessel "Richard E. Hodges" upbound on the Ohio River with twelve (12) loaded coal barges in tow. There were twenty-eight (28) lights on the towboat, including running lights (60 watt bulbs), guard lights (100 watt bulbs) and two (2) flood lights. There were three (3) lights on the barge, green, yellow and red located on the bow of the barge and eight (8') feet above the waterline, and visible for three (3) miles. The "Richard E. Hodges" was owned and operated by the I&M Electric Company, and Pilot Gaines was in the employ of I&M. At approximately 11:15 o'clock p. m., Central Daylight Time, the tow was located at approximately Mile 814 above Evansville, Indiana. At this particular place in the Ohio River, it is, and was at all times pertinent herein, a navigable stream. The weather was clear, the river calm, and it was an exceptionally dark and moonless night.

6. At approximately 11:00 p. m., July 3, 1978, at the request of Collins, Gardner took Collins and a third person for a boat ride. It was an open cockpit, fifteen (15') foot fiberglass hull motorboat. The boat was a 1959 model Avalon powered by a fifty (50) horsepower outboard motor. It was equipped with the required running lights on the front of the boat (red and green) and white lights on the stern. There is no evidence that all lights were not operating properly. The boat was equipped with an electric horn.

7. In the operation of the Gardner boat, Gardner sat on the port side of the craft behind the steering wheel of the boat. Collins sat on the top of the backrest of his seat, which was on the starboard side of the craft. Collins, acting as a lookout, was shining the beam of a hand held spotlight in the water in the path of the boat in order to observe and avoid any driftwood, snags, or other debris floating in the river. Having started the motor and pushed off from the sandbar, Gardner guided the boat directly across the river toward the Union Harbor Marina on the Indiana side. The motorboat crossed the bow of the Richard E. Hodges on its course across the river, coming within approximately fifty (50') feet of the bow. Both plaintiffs testified that they were not aware of the presence of the towboat or the barges. When the motorboat neared the Indiana side of the river, Gardner made a one hundred and eighty (180°) degree turn toward the down stream side of the river, and started back toward the Kentucky shore. The Richard E. Hodges was in the path of the motorboat as it headed for the Kentucky shore. The motorboat was traveling at least ten to fifteen miles per hour as it was headed back toward the Kentucky shore. The boat was planing the water; consequently, there was no physical object obstructing the plaintiffs' vision. Neither of the plaintiffs saw the Richard E. Hodges

in their path, as the motorboat ran directly into the second barge back from the bow of the tow on the port side.

8. Two Deputy Sheriffs testified that upon observing plaintiff Gardner at the hospital some two hours (2) after the accident, his speech was slurred and the smell of alcohol was prevalent, and in their opinion he was intoxicated. Collins was under the influence of alcohol while in Gardner's boat, as his blood alcohol level tested approximately .15 percent, some one and one-half to two hours after the accident. Doctor Venables testified that he probably would have tested at least .20 at the time of the accident. A blood alcohol level of .10 is considered under the influence pursuant to Indiana law.

The influence of alcohol affected the judgment, motor skills, reaction time and perceptual capabilities of both Collins and Gardner. Doctor Venables, the pathologist, testified that it was like wearing sun glasses at night.

9. Pilot Gaines held a United States Coast Guard Master's and First Class Pilot's license, which allowed him to operate uninspected towing vessels upon the inland waters of the United States and the "Western Rivers." The area of Mile 814 on the Ohio River, where the collision occurred, is part of the "Western Rivers." Pilot Gaines was operating the Richard E. Hodges as agent of the I&M Electric Company. Pilot Gaines observed Gardner's boat leave the Kentucky shore, saw it cross the bow of his tow at a distance of some fifty (50′) feet, saw the boat make a one hundred and eighty degree (180°) turn at the Indiana shore and head back toward the Kentucky shore, and saw the motorboat come directly back at his tow and hit the tow at the second barge back on the port side of his flotilla. Only Pilot Gaines' right eye is functional. He had lost the sight in his left eye a few years before.

10. Immediately after the crash, Gaines blew four (4) short blasts on his horn (the danger signal), put his tow in neutral, and turned on his search lights to observe the disabled motorboat. He then directed his search light along the tow to see if any person was thrown from the motorboat into the water on impact. Gaines then notified the Coast Guard about the collision, as required, and he kept his tow in the vicinity of the collision until told by the Coast Guard that assistance had been rendered and he could go on.

11. At the time of the collision, all required lights were burning on the flotilla of barges and on the Richard E. Hodges itself. The running lights at the bow of the flotilla had been checked at the change of shift, some fifteen to thirty minutes before the collision. The deck-mate had picked up the required red, yellow and green lights from their stands at the bow of the flotilla, and turned them around to show the pilot that they were working. The deck-mate then returned them to their respective stands. All positive evidence is that the required lights on both the Richard E. Hodges and on the flotilla of barges were placed in the proper places, illuminating at the required intensity, and illuminating in the proper directions.

12. Pilot Gaines did not sound his horn, shine his spot or search lights, or utilize any extraordinary means to make the tow's presence known to the plaintiffs.

13. Upon impact, the tow did not stop to render direct assistance to the plaintiffs; rather, the boat put its engines in neutral and notified the Coast Guard. There is some confusion as to the lapse of time before this was done. Pilot Gaines testified it was approximately five (5) minutes, while the Coast Guard Log shows it to be forty-five (45) minutes. From the evidence, and upon examining the Coast Guard Log, there were several accidents reported at or near the time of this accident, and the Court concludes that it is likely that due to the busy traffic the Coast Guard entry was not promptly made. The tow did not reverse its engines in an effort to back up and assist the injured boat, because to do so might have sucked the injured persons under the tow. To actually stop, it would have been necessary to tie the barges up at a secure location, and to proceed back to the

plaintiffs with only the tow boat. Such a procedure would have taken at least two (2) hours.

14. Pilot Gaines did not change the course of his tow and slacken his speed before impact. To do so would have taken about two times the length of his tow (the tow length being about Nine Hundred Forty Feet (940′) and would have been a useless effort in terms of avoiding the collision.

15. Pilot Gaines did not launch the small john boat on board the Richard E. Hodges in order to render assistance to the plaintiffs. The john boat had no motor, no running lights and no search light, and was not used as a rescue vehicle. To put it in the water on a dark night would have jeopardized the lives of those in it.

16. The plaintiffs' motorboat was a smaller, more maneuverable vessel than the defendant's towboat.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter herein.

2. The Rules of the Road—Western Rivers, Title 33 U.S.C. §§ 301–356, are applicable to this cause of action.

3. A steam vessel of less than sixty-five (65) feet in length which can maneuver easily shall not hamper the safe passage of a large vessel or vessel with tow that is ascending or descending a river. Title 33 U.S.C. § 348a. Gardner's boat was less than sixty-five feet (65′) in length and was both smaller, lighter and more maneuverable than was the towboat. However, the motorboat did not yield the right-of-way to the Richard E. Hodges, and, thereby violated Title 33 U.S.C. § 348a.

4. A steam vessel should not sound the danger signal unless steam vessels are approaching each other and one of the vessels for any reason fails to understand, or regards as unsafe, the course or intention of the other. Title 33 U.S.C. § 349; *In Re O. L. Schmidt Barge Lines, Inc.,* 475 F.2d 428 (7th Cir. 1973). The penalty for unnecessary sounding of a whistle is revocation or suspension of the pilot's license. 33 C.F.R. § 95.43. When Pilot Gaines saw the motorboat pass his bow at a distance of some fifty feet (50′), he exercised his experience and judgment and did not blow his danger signal. The fact that a collision did not occur at that point indicated that Gaines' judgment was sound. When the motorboat made a U-turn and headed back for the Kentucky shore, and directly at the barge flotilla, he did not blow the danger signal because he felt that the plaintiffs surely saw the barge flotilla, and, consequently, he felt that there was no danger of collision. Testimony at trial indicated that frequently motorboats approach barge flotillas at perpendicular angles, and that to blow the danger signal everytime such an occurrence took place would be imprudent. Furthermore, expert testimony indicated that to blow the horn in such circumstances would not stop motorboats from running dangerously close to barge flotillas, and would result in overuse of the danger signal. Consequently, Pilot Gaines' failure to blow the danger signal was not a violation of Title 33 U.S.C. § 349, but was a rationally based decision under the facts and law herein.

5. Since it was not unusual for motorboats to approach barge flotillas at perpendicular angles, Pilot Gaines could not have known there was a significant risk of collision until just seconds before impact. The barge flotilla in question was lighted and there was no reason to suspect that the plaintiffs could not see it. Consequently, it is very unlikely that Pilot Gaines had ample opportunity to blow the horn as a warning, and even if he could have blown the horn, it is unlikely that collision could have been avoided in the short time span just before impact considering plaintiffs intoxicated conditions.

6. Plaintiffs have argued that lights should have been placed along the side of the barge flotilla. Title 33 U.S.C. § 311 provides:

The rules concerning lights shall be complied with in all weathers from sunset to sunrise, and during such time no other lights which may be mistaken for the

prescribed lights or impair their visibility shall be exhibited.

The Court will not second guess this country's legislative branch of government. Consequently, whatever, the rational merits of plaintiffs argument might be, this Court finds that it was not negligence to fail to have lights displayed on the sides of the barge flotilla.

7. While plaintiffs may not have seen the lights on the barge flotilla, the credible evidence does show that all lights required by law were on the barges and functioning properly. Consequently, there was no negligence on the defendant's part from this standpoint.

■ 8. Every steam vessel, when approaching another vessel so as not to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse. Title 33 U.S.C. § 346. In the case before the Court, there was no definite, recognizable risk of collision until just seconds before impact. Since the collision impact was on the port side of the barge flotilla, at the second barge back from the bow, to slacken speed would merely have moved the spot of collision impact farther towards the bow of the flotilla. Consequently, failure to slacken speed could not have caused or contributed to the collision. The failure to slacken in this case was not a statutory violation.

9. Testimony showed that to stop and reverse the engines of the Richard E. Hodges might well have sucked the plaintiffs under the Richard E. Hodges. Therefore, Pilot Gaines' decision not to reverse the engines was not only a wise decision, but perhaps the best decision from the standpoint of the health and safety of the plaintiffs.

■ 10. The "Stand By Act," Title 33 U.S.C. § 367, provides that the master of a vessel must stay by the vessel damaged in a collision with his vessel until said injured vessel has no need of further assistance. Pilot Gaines complied with this statute by reporting the collision to the Coast Guard as soon as it was practicable after the accident and by staying in the vicinity of the acci-

dent until told by the Coast Guard that assistance had been rendered to the plaintiffs and that he could continue on. While there was some confusion as to the precise lapse of time before Pilot Gaines reported the accident to the Coast Guard, such confusion was probably the result of the large amount of activity on the part of the Coast Guard, which was occurring at or about the same time of this accident. Furthermore, Gaines tried to direct assistance to the plaintiffs' craft by shining his search/spot light on the craft.

11. To call the Coast Guard and to try and direct another vessel to the assistance of the crippled motorboat showed better judgment than if Pilot Gaines had tried to tie off his barges and go back to the crippled vessel with the Richard E. Hodges to render help.

■ 12. When a vessel has been guilty of a statutory fault at the time of a collision, the burden rests upon that vessel to show not merely that her fault might not have been one of the causes, but to prove that it could not have been the cause of the accident. This rule applies to all vessels. *The Pennsylvania v. Troop*, 86 U.S. 125, 19 Wall 125, 22 L.Ed. 148 (1874).

■ 13. The plaintiffs' vessel violated a statute, Title 33 U.S.C. § 348, when she failed to yield a right-of-way to the Richard E. Hodges. Furthermore, plaintiffs violated Section 235.240(2), Kentucky Revised Statutes, by operating a motorboat while intoxicated, and they also violated Section (6) of the Kentucky Rules of the Road. Consequently, plaintiffs had to prove that they could not have been the cause of the accident. Plaintiffs have not met this burden of proof.

14. To a degree both vessels had the right to assume that the other's vessel would act reasonably. *CIA Maritima San Basillio S.A. v. Shell Canada Ltd.*, 490 F.2d 173 (1st Cir. 1974). The defendant's vessel did act reasonably, as it complied with all statutory requisites in its operation and in its attempt to render proper aid to the plaintiffs after the collision. The plaintiffs

did not act reasonably in running a motorboat at a rapid speed on the Ohio River on a dark, moonless night while both were under the influence of alcohol. Under the facts of this case, the defendant's assumption that the motorboat would not run into a lighted barge was within the degree of reasonableness contemplated by the above law.

■ 15. A vessel cannot be held liable for failure to maintain a proper lookout where her officer(s) actually see an approaching vessel. Therefore, Pilot Gaines' operation of the Richard E. Hodges with only one good eye cannot be deemed as a failure to maintain a proper lookout. He saw the motorboat before, during, and after the collision. Furthermore, 46 C.F.R. § 10.-02–9(f)(5), allows a person with but one good eye to obtain a pilot's license; consequently, the lack of vision in one eye is not per se evidence of negligence or a statutory violation.

16. The accident involved herein was unfortunate and it did cause serious and perhaps permanent injuries to the plaintiffs. The Court, however, finds that the cause of the accident was the plaintiffs own folly in being out on the river in a pleasure boat on a dark night while under the influence of alcohol. While the injuries that occurred are regrettable, the Court cannot find that the defendant should be required to respond in damages.

17. For the above reasons, the Court finds the Plaintiffs, Donald P. Collins and Joseph Gardner, 100% negligent and Defendant 0% negligent in the accident involved herein.

18. Any Conclusions of Law deemed to be a Findings of Fact shall be so designated, and vice-versa.

19. The law is with the defendant and against the plaintiffs.

IT IS SO ORDERED.